IN THE SUPERIOR COURT OF SUMTER COUNTY
STATE OF GEORGIA

GEOFFREY CRISLER,
CHRISTOPHER CRISLER, and
TIMOTHY SCOTT CRISLER,

Plaintiffs,

v.

PAUL O. FARR,
RUSS F. BARNES,
WILLIAM D. NESMITH, III, and
BARNES AND NESMITH, P.C. (f/k/a
Barnes, Farr & NeSmith, P.C.),

Defendants.

Georgia, Sumter County,

Filed in office _17_ day of

_____ January 20 12

Danny C. Smith

Dep. Clerk

CIVIL ACTION NO.

10-CV-17

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

"It's no wonder that truth is stranger than fiction.  Fiction has to make sense."
--Mark Twain

### I.    INTRODUCTION

Simply put, this case involves the most bizarre and outrageous facts concerning a lawyer's conduct that this court has ever heard or could possibly have imagined.[1]

Paul Farr was a lawyer who, for no apparent reason, fabricated and forged several documents; repeatedly lied to his clients, partners and family; kited checks on his firm's accounts; and ultimately surrendered his law license in disgrace.  His reckless conduct has spurred two lawsuits and harmed truly innocent people --

---

[1] Perhaps the most cruel and sadistic of bar examiners on an extraordinarily bad day could have created such an outlandish and complex fact pattern.

namely his former clients. Sadly, the Court predicts that the lawyer's actions in this case will soon find their way into Ethics textbooks around the country and be haled as the perfect example of exactly what a lawyer should NOT do.

Briefly, Paul Farr, a former law partner of Bill NeSmith and Russ Barnes, served as the Plaintiffs' attorney from January, 2005 to December, 2006. Plaintiffs hired Farr and his former law firm to investigate and pursue a potential claim for the wrongful death of their mother, Ginny Crisler.

However, for some unknown and unexplainable reason, Farr never filed the lawsuit. Rather, Farr conjured up an elaborate scheme involving fake letters to fictitious insurance adjusters and opposing attorneys, bogus pleadings, fabricated letters, false settlement documents and untold outright lies. After he "settled" the Plaintiffs' claim for $1,000,000.00, he then kited checks on his firm's accounts (without his partners knowing a thing) to pay the Plaintiffs the supposed proceeds. Next, he lied to his father-in-law to obtain a $1,000,000.00 loan to repay the bank that covered the kited checks. After his former law partners discovered the extent of his lies and confronted him, Farr admitted to what he had done. But, his trouble did not end there.

His father-in-law then sued the Plaintiffs to return the million-dollar "settlement" that Farr had given them and that he had unwittingly and unintentionally funded.

After a protracted legal battle[2], the Clarke County Superior Court entered judgment against the Plaintiffs for approximately $1,350,000.00.[3]

In this suit, Plaintiffs allege that the Defendants' legal malpractice, fraud, negligence, and breach of fiduciary duty forced them to settle their underlying wrongful death claim for far less than its true value. They also contend that the Defendants' action caused them to incur significant attorneys' fees (in addition to the underlying judgment in favor of Farr's father-in-law) to defend themselves in the suit filed by Farr's father-in-law to recover the $1,000,000.00 Farr gave them.[4] Finally, Plaintiffs seek punitive damages and attorney's fees (in this case) against all Defendants.

Each defendant has filed a Motion for Summary Judgment and requested oral argument. Pursuant to USCR 6.3, the Court held oral argument on the Defendants' motions on July 26, 2011.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is a preventive procedure aimed at stopping certain cases from reaching trial where the nonmoving party has no cause of action, even when considering the admissible evidence in the record in his favor. *Meade v. Heimanson*, 239 Ga. 177, 179-80 (1977). The summary judgment standard of

---

[2] *Haugabook v. Crisler*, 297 Ga.App. 428 (2009), cert. denied, *Crisler v. Haugabook*, 2009 Ga. LEXIS 622 (Ga., Oct. 5, 2009), subsequent appeal at, decision reached on appeal by *Crisler v. Haugabook*, 307 Ga.App. 796 (2011), cert. granted in part, *Crisler v. Haugabook*, 2011 Ga. LEXIS 620 (Ga., Sept. 6, 2011).

[3] *Crisler v. Haugabook*, 307 Ga.App. 796 (2011), cert. granted in part, *Crisler v. Haugabook*, 2011 Ga. LEXIS 620 (Ga., Sept. 6, 2011) (affirming trial court's award of prejudgment interest from time of demand on liquidated damages).

[4] As of the date of the oral argument, Plaintiffs owed approximately $400,000.00 on the judgment issued against them by the Clarke County Superior Court.

review heavily favors the nonmoving party since a grant of such a motion thwarts the nonmoving party's right to a trial by jury. *Service Merchandise, Inc. v. Jackson*, 221 Ga. App. 897, 898 (1996).[5]

To prevail on a motion for summary judgment,

> the moving party must demonstrate that there is *no genuine issue of material fact* and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.
>
> O.C.G.A. § 9-11-56(c); *Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 491 (1991) (emphasis added), abrogated in part on other grounds, *Robinson v. Kroger Co.*, 268 Ga. 735, 735 (1997).

The moving party must bear this heavy burden even as to issues upon which the opposing party would have the burden at trial. *Williams v. Chick-fil-A, Inc.*, 274 Ga. App. 169, 169 (2005).

The deference given the nonmoving party does not mean the rules of evidence do not apply to a motion for summary judgment. *Real Estate International, Inc. v. Buggay*, 220 Ga. App. 449, 451 (1996). Both parties are required to produce *admissible* evidence at the summary judgment stage.[6] Courts also construe self-contradictory statements against the interest of the speaker (irrespective of the summary judgment standard) when no plausible explanation is presented. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30 (1986). Georgia courts have

---

[5] See also, *Bruno's Food Stores, Inc. v. Taylor*, 228 Ga.App. 439, 441 n.1 (1997) ("In the case sub justice, favorable inferences may be drawn by the trial court on behalf of the plaintiff/non-moving party, since the granting of a motion for summary judgment deprives the non-moving party of his right to a trial by a jury contrary to the Constitution of the State of Georgia and of the United States. Ga. Const. of 1983, Art. I, Sec. I, Par. XI; U.S. Const., Amend. VII.").

[6] See, *Barich v. Cracker Barrel Old Country Store, Inc.*, 244 Ga.App. 550, 551 (2000) ("[All evidence produced for summary judgment must be held] to the same standards of admissibility as evidence at trial and evidence inadmissible at trial [such as hearsay] is generally inadmissible on motion for summary judgment.").

repeatedly held that "[g]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment." For example, *Brown v. Amerson*, 220 Ga. App. 318, 320 (1996). Georgia law is clear that there must be more than a "scintilla" of circumstances to carry the case to the jury. *McCarthy v. Nat'l Life & Accident Ins. Co.*, 107 Ga. App. 178, 182 (1962).

The moving party may win summary judgment in three ways: first, the moving party can present admissible evidence in support of the motion. *Lau's Corp., Inc.*, 261 Ga. at 491. If successful, the burden shifts to the nonmoving party to bring forth any contrary admissible evidence to survive summary judgment.[7] Second, the moving party may merely point to the record to reveal a lack of evidence supporting an essential element of the claim. *Lau's Corp., Inc.*, 261 Ga. at 491. In that event, the nonmoving party cannot rest upon its pleadings, but must bring forward specific admissible evidence giving rise to a triable issue of fact. *Speir v. Krieger*, 235 Ga. App. 392, 397 (1998). Third, the moving party may present admissible evidence establishing a *prima facie* affirmative defense. *Garrett v. Nations Bank, N.A. (So.)*, 228 Ga. App. 114, 116 (1997). If successful, the burden shifts to the nonmoving party to bring forth *any* contrary admissible evidence that creates a jury issue on an element of the affirmative defense. *Id.*

The Court may not resolve evidentiary disputes or weigh the credibility of

---

[7] *See, Evans v. Sparkles Mgmt. LLC*, 290 Ga.App. 458, 460 (2008) ("In passing upon a motion for summary judgment, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists.").

witnesses, "but [may] only look to see if there is an issue [of fact in deciding motions for summary judgment]."[8] If the record reveals any conflict of admissible evidence creating an issue for the jury, the Court must deny the motion. With this standard in mind, the Court rules as described below.

## III. FACTS

As noted in the preamble, this case involves a bizarre web of lies, deceit and fraud concocted and carried out by Paul Farr. Ultimately, Farr lost his law license and significantly harmed his reputation in the community. However, and tragically, his unexplainable actions and conduct not only hurt himself, but caused his former clients, law partners and even his immediate family to be caught in his most destructive wake. Because Farr's actions are so bewildering and confusing, the Court has taken great pain to explain the facts in as much detail as possible so as to provide the most complete context possible to its ruling and to assist an appellate court in any potential review of the Court's decision.

The unusual and unique series of events that give rise to the present case began seven years ago when an unknown hit-and-run motorist struck and killed Ginny Crisler as she attempted to cross the parking lot of Hunter's Mill Shopping Center in Albany, Georgia. Ms. Crisler left behind three sons: Timothy Scott Crisler ("Scott"), Geoffrey Wayne Crisler and Christopher Davis Crisler ("Plaintiffs" or the "Crislers").

---

[8] *Fountain v. World Fin. Corp.*, 144 Ga.App. 10, 13 (1977); accord, *Ginn v. Citizens and S. Nat'l Bank*, 145 Ga.App. 175, 178 (1978) ("[W]here material issues can be eliminated only by making credibility judgments, the movant has not met his burden.").

The Crislers entered into an attorney-client relationship with the law firm of Barnes, Farr and NeSmith, P.C. (the "Firm") on January 12, 2005, to probate their mother's will and to investigate and possibly pursue a claim for her wrongful death. As the executor of his mother's estate, Scott Crisler executed a written contingent fee agreement to memorialize the attorney-client relationship.

At all relevant times, the law firm of Barnes, Farr and NeSmith, P.C. consisted of principals Russell F. Barnes, Paul O. Farr and William D. NeSmith. Although Farr primarily handled the Crislers' case, Barnes and NeSmith knew the Crislers to be clients of the Firm regarding the death of their mother. Farr admits that, at all times when dealing with the Crislers, he acted on behalf of the Firm. Defendant Farr's improper handling of the wrongful death claim lies at the core of the Crislers' present claim for damages.

Farr admits that in a "John Doe" hit and run wrongful death case where property owners are accused of negligently maintaining their property or otherwise posing a risk of harm to business invitees, a prudent lawyer should investigate all potential leads as soon as possible before "evidence can get lost or people can forget things." However, Farr failed to take any action whatsoever in the investigation, as discussed further below. Thus, Farr's negligence, misconduct and deceit, began almost as soon as he undertook the Crislers' representation.

Farr's first identifiable written misrepresentation can be found in a June 17, 2005, email that he sent to Scott advising him that he had received a response to a Freedom of Information Act request. Farr clearly intended this statement to deceive Crisler and to cause him to believe that he had begun to work actively on his case

because Farr never sent an FOIA request from which he could have received a response.

Farr continued to lead the Crislers to believe that he was actively pursuing their claims when he emailed Scott a purported demand letter in July concerning his mother's wrongful death. However, this supposed demand letter was nothing more than a fabrication by Farr. While Farr may have in fact authored a demand letter, he sent the letter to a fictitious person he had made up at Liberty Mutual Insurance Company. When Liberty Mutual returned the letter to Farr advising that it did not provide liability insurance for the incident, Farr intentionally withheld the letter from the Crislers so that his lies would not be exposed.

Farr continued to fabricate progress in the lawsuit as months passed. On August 19, 2005, Farr emailed Scott, advising of ongoing telephone communications with the potential defendants' liability insurance carrier and his preparation of the lawsuit. In fact, Farr had not spoken with anyone about the claim or the suit. On November 29th, Farr drafted and forwarded to Scott a Complaint, an Answer, the Plaintiff's First Interrogatories, and the Plaintiff's Request for Production of Documents; however, each of these documents, **even those that appeared to be from opposing counsel and the insurance company,** had all been forged and fabricated by Farr.[9] In reality, Farr never filed the complaint and simply made up the other documents in order to continue to deceive the Crislers.

---

[9] The Court notes that it took Farr much more work and effort to devise an elaborate scheme to defraud his clients than to simply do the right thing.

On December 7th, Farr lied to Scott when he emailed him to confirm a specially-set trial and to advise him of upcoming depositions. Again, none of the documents actually existed – Farr had made them all up.

On December 12, 2005, Farr took a rare legitimate action in the case when he sent a letter to the prospective defendants in the wrongful death matter requesting the identity of their insurance carriers and the amounts of available coverage. Naturally, Farr could not provide a copy to Scott since he had already lied to him, causing the Crislers to believe that he already had accomplished significantly more in the case than just these initial basic inquiries.

After another series of false explanations by Farr attempting to explain delays of depositions and events in the lawsuit that he had yet to file, Farr told Scott on April 25, 2006, that the court had granted summary judgment as to liability in favor of the Plaintiffs. On September 11th, Farr called Scott and told him that the defendants were offering the policy limits to the Crislers if they would settle the claim. Scott claims that during this conversation, Farr confirmed that the settlement amount would be $2,000,000.00 from two separate insurance carriers. Scott understandably accepted what Farr knew to be an entirely sham settlement offer.

On September 29th, Farr emailed Scott and described a make-believe talk with the "other side," assuring him that settlement funds would be wired and settlement documents would be sent via overnight delivery. These statements were obviously untruthful. On October 13th, Farr furthered his scheme when he sent Scott a Liability Release of All Claims, supposedly releasing George C. McIntosh and Langdon S. Flowers, Jr. from all claims arising from the incident occurring in Hunter's Mill

Shopping Center that resulted in the death of Ms. Crisler. In reality, Farr had drafted this document as well. Scott Crisler, as executor of Ginny Crisler's estate, signed the Liability Release of All Claims on October 19th.

On October 20th and November 1st, Farr actually sent two demand letters regarding the wrongful death of Ms. Crisler to the proper insurance company representatives. However, Farr hid a copy of those letters from Crisler since this would reveal not only that the previous demand letter was fictitious, but it also would have exposed Farr as the fraud that he had become.

On November 7th, Crisler forwarded Farr the wiring instructions for the settlement funds that had been prepared by his financial advisor, Keith Ledford. On November 15th, Crisler received another fabricated document from Farr (created by using the letterhead of Central Bank), which blamed the wiring delay on federal Homeland Security law. In an email to Ledford and Crisler that same day, Farr advised that the wire would be funded the following Friday.

On November 17th, Farr advised Crisler in an email that the total wire would be $702,427.35, the first time that Farr discussed specific disbursement numbers with Crisler. Crisler told Farr of his continued belief that the gross settlement should be $2,000,000.00 and asked Farr to forward the proceeds of both insurance policies that Farr had led him to believe existed. Farr then advised Crisler that he mistakenly settled with only one insurer for a single million dollars; however, because of the misunderstanding, there would be no attorney fees deducted from this first settlement and Farr would aggressively pursue the second million. Because of his "mistake", Farr also apparently agreed to reduce the Firm's fee by 10%, pay interest because of

the delay, and defer the Firm's fee until he recovered the proceeds of the second insurance policy.

On November 21, 2006, Farr forwarded Crisler a purported demand letter addressed to St. Paul Travelers Insurance Company for the "second" million dollars, but Farr never mailed it. That same day, Farr emailed Crisler to inform him that he had spoken with the bank and it was putting another 24-hour hold on the wire because of the federal Patriot Act. Again, Farr had done no such thing; he merely lied to cover up his previous lies.

Apparently exhausted of stall tactics, Farr began writing checks on the Firm's accounts as a vehicle to get the bank to fund the fictional settlement wire on November 22, 2006. The Firm maintained several accounts, including a trust account and a petty cash account at Sumter Bank and Trust (SB&T), a trust account at Central Bank (Central), and a trust account at Citizen's Bank of Americus (Citizens). The Firm's three partners, Barnes, Farr and NeSmith had check-signing authority on all four accounts.

On the morning of November 22, Farr wrote check #5495 for $1,000,015.00 drawn on the Firm's trust account at SB&T and deposited it into the Firm's trust account at Citizens. He then wrote check #9602 for $1,000,015.00 drawn on the Firm's trust account at Citizens and deposited it into the Firm's trust account at SB&T. Next, Farr wrote another check drawn on the Firm's account at Citizens, check #9603 for $1,000,015.00, and delivered it to Central where an employee deposited it into the Firm's trust account. While at Central, Farr signed a Wire

Transfer Form directing Central to wire a total of $1,000,000.00 to the Crislers pursuant to his wiring instructions.

On November 22, 2006, Central President Ben Dupree called Barnes and told him that Farr had initiated a $1,000,000.00 wire. Dupree wanted to confirm that Barnes knew of the wire because Farr had deposited a Firm check drawn on Citizens for $1,000,000.00 into the Firm's trust account at Central, and Dupree told Barnes that he did not understand why Farr did not simply wire the money out of the Citizens account.

Later that day, Central employee Janet Porch "keyed in" the wire and then left for the day. When Porch returned to work on Friday, November 24, 2006, the day after Thanksgiving, she found that the November 22nd wire transfer had failed. Porch then advised Farr that the transfer failed because the Wire Transfer Form identified that each Crisler brother should receive funds, but contained no instructions as to how much each brother should receive. Farr gave Porch the amounts for the three new separate wires ($334,000.00, $333,000.00, and $333,000.00) and Porch "re-keyed it". The Crislers' financial advisor, Ledford, had previously established a separate account for each brother at National Financial Services ("NFS"). NFS owned the account at J.P. Morgan Chase Bank where the funds were ultimately to be wired, as confirmed by the wire transfer reports.

On the morning of November 24, 2006, Farr wrote another check, #1206, for $1,000,045.00 drawn on the Firm's petty cash account at SB&T and deposited it into the Firm's trust account at Citizens because "...[he] was concerned that one of those checks he had already written was going to bounce." Farr telephoned Mr. Turner at

SB&T and told him that he had written an SB&T check to clients for $1,000,000.00 in anticipation of insurance money coming in, but that had not yet occurred. Farr asked Turner to "hold" the check.

Next, Farr created a sham letter, purportedly from Zurich Insurance Co., confirming that the insurance company had mailed a settlement check to Farr in the amount of $1,000,045.00[10] Thereafter, Farr faxed the fake Zurich letter to SB&T as an inducement for the bank to cover check #1206. Turner testified that during his call to Barnes that day, he told him of the conversation with Farr and asked Barnes why SB&T needed to cover an overdraft of $1,000,000.00. Turner testified that Barnes said he would "find out and get back to me" because he was unaware of the million-dollar check or "anything that was going on that may be coming in."[11]

On November 27th, Turner reviewed the transactions between the banks involved and "could see a kite." As a result, Turner claims that he called Barnes and talked to him two or three times that day, advising Barnes of a million-dollar check kite involving the Firm's accounts and Farr. Turner testified that Barnes told him that he had met with Farr and NeSmith and that Farr was going to get the check covered, and that Barnes would contact the Georgia State Bar because of rules about "fooling with" trust accounts. However, Barnes denies that Turner specifically notified him of an actual check kite on November 27th, although he acknowledges there was some communication regarding the petty cash account check written by Farr.

---

[10] Farr created this alleged correspondence from Zurich by cutting and pasting the Zurich logo onto a blank sheet of paper and then drafting the contents of the letter himself.

[11] Contrary to Turner's testimony, Barnes recalls his first conversation with Turner as occurring on November 27, 2006.

Crisler v. Farr<br/>
10-CV-17<br/>
Page 13

Consequently, by the evening of November 27th, Barnes told NeSmith that Turner had called and indicated that he thought that Farr had kited a check for $1,000,045.00 out of the Firm's petty cash account at SB&T and asked NeSmith what he knew about the situation. NeSmith called Barnes later to let him know that he had located Farr and told him to call Barnes to explain the situation.

According to Barnes, sometime on November 27th, his real estate paralegal told him that she was missing a check from the Citizens trust account and a check from the SB&T trust account. Once Barnes learned of the petty cash account check, he personally contacted the banks to find out the status of the missing trust-account checks. Prior to leaving his office around 7:00 PM, Barnes received a fax from the Wal-Mart branch of Citizens, which included the initial SB&T trust account check that Farr deposited into Citizens and a copy of the petty cash account check that he deposited into Citizens, including the deposit slips. Barnes was surprised to see that the trust account checks were handwritten because the Firm typically used computer-generated checks.

Finally, Barnes received a call from Farr at home on the night of November 27th. Farr told Barnes that he represented the Crisler brothers in the wrongful death suit of their mother and that they had asked him for help in getting life insurance companies to pay on two policies that their mother had totaling $2,000,000.00. Farr explained that the companies had agreed to pay the money, that he had previously received $1,000,000.00, and that this was the "second" million. He said that the Crislers were going to be in town for Thanksgiving and wanted the money, so he went ahead and wrote a check out of the petty cash account and gave them the

money based upon a letter from Zurich confirming that the second million dollars was on the way. Surprisingly, Barnes testified that he did not ask Farr about his conversation with Dupree regarding the $1,000,000.00 wire from the Firm's trust account at Central, which conflicted with Farr's story about writing the Crislers a check.

On that same evening, Farr approached his father-in-law, Richard C. Haugabook ("Haugabook"), about borrowing $1,000,000.00. Farr lied to Haugabook when he told him that he had settled a case with an insurance company and written firm trust account checks for $1,000,000.00 to the clients before he had received funds from the insurance company, and that there was not any money in the trust account to cover the checks.

Hence, on November 28, Haugabook met with Barnes, Farr and NeSmith at the Firm's office. Acting alone, Farr cut and pasted Scott Crisler's signature from the fraudulent Release of All Claims to create a false life insurance release that he showed to his law partners and Haugabook at that meeting to explain why the Firm was not going to get any attorney fees.[12] As he had done before, Farr fabricated another Zurich letter (although this time unsigned) to say that the insurance company would deliver the life insurance proceeds by December 8, 2006. Subsequently,

---

[12] The Court finds that there is absolutely no evidence to suggest that NeSmith and Barnes conspired with Farr to fabricate these documents intended to induce Haugabook to loan the money to cover the checks that Farr had kited. Rather, the evidence in this case clearly shows that Farr created and executed the scheme alone.

Haugabook agreed to loan Farr $1,000,000.00 relying solely upon an unsecured promissory note.[13]

Farr signed the promissory note to Haugabook, which obligated Farr to repay the $1,000,000.00, bearing interest at eight percent (8%) per annum, with the principal and interest due and payable on December 28, 2006. Farr filled out Haugabook's check for $1,000,000.00 and made it payable to himself. Haugabook then signed the check and gave it to Farr, who deposited it into the Firm's petty cash account at SB&T that afternoon. Barnes and NeSmith both knew Farr was going to deposit the check into the Firm's petty cash account at SB&T to cover the overdraft. After the meeting with Haugabook, Barnes recalled that he and NeSmith discussed that they were glad Farr had gotten the money to put in the checking account, but did not recall having any discussion about the Crislers at that time.

After receiving the loan from Haugabook to cover the overdraft, Barnes asked the Firm's bookkeeper to find the transactions where Farr made the supposed first $1,000,000.00 payment to the Crislers. Barnes wanted to see "how [Farr] transferred the first million, when it came in and when it went out." In a meeting with the bookkeeper on December 6th, the bookkeeper reported that she could not find the transaction where the Firm had received $1,000,000.00, other than the loan from Haugabook. Around this time, Barnes discovered that Farr had floated the money between the three banks and the trust account and he shared that information with NeSmith.

---

[13] Defendants Barnes and NeSmith assert that Haugabook made the loan to Defendant Farr personally, rather than to the Firm collectively.

Upon discovering that the alleged "first" million dollars could not be located, Barnes spoke with NeSmith and the two of them met with Farr. Farr confessed that he had previously "panicked" and admitted that there was not $2,000,000.00 in insurance money. Farr finally explained that he had given the Crislers $1,000,000.00 which the Firm did not have and then borrowed $1,000,000.00 from Haugabook to cover the overdraft with SB&T.

Sometime after November 27th, Farr also told Barnes and NeSmith that he never actually filed the wrongful death action on behalf of the Crislers, but that "the statute would expire the following week, and he was going to make sure that the [suit was filed] and the case would proceed."

At that time, Barnes "had no understanding whatsoever what the Crislers had been told" because he had not yet spoken with them. Upon learning on December 6th that the Crislers' financial advisor, Ledford, had called and left a message at the Firm during the week of Thanksgiving about a problem with the wire, Barnes decided to call Ledford, but did not reach him and left a message. Barnes subsequently spoke with Ledford on December 7th and asked him whether they were dealing with $2,000,000.00 or only $1,000,000.00. Ledford informed Barnes that he was only aware of $1,000,000.00. Barnes did not advise Ledford of the other information that he had learned about the transaction.

Following Barnes' call to Ledford, Scott Crisler called Barnes on the afternoon of December 7th. Barnes returned the call and had his first conversation with Scott Crisler. During the call, Crisler described what he believed to be the circumstances of the wrongful death settlement. Specifically, Scott believed that Farr had made a

mistake and only pursued one of the liability policies, but indicated that he was going after the other available insurance policy. Barnes then asked him if his mother had any life insurance, and Crisler responded that she did not. Barnes also asked Crisler to send him all the documents that Farr had forwarded to him, which Crisler said he would do the next morning. During that call, Barnes did not tell Crisler that the money he received had not come from an insurance company.

Barnes then met with NeSmith and told him the information that he received from Crisler. For the first time, Barnes told Farr that he wanted to see the Crislers' file and that he was going to talk with the client. Farr responded that the file was at his home.

On December 8th, NeSmith contacted Zurich and located an adjuster, who advised him that there was no indication of a settlement or any money paid out on the particular case. After discovering that no settlement had actually occurred, NeSmith called Haugabook and told him that there had never been a settlement and there would be no money coming in from insurance.

Later that morning, Barnes convened a meeting with NeSmith and Haugabook. Barnes laid out for Haugabook what he had learned from the documents and his various investigative conversations about what had actually occurred. NeSmith then immediately left to file the Crislers' wrongful death lawsuit in Albany; however, he did not call the Crislers to tell them everything he had learned before he left for the courthouse.

Later that day, Barnes did call Scott Crisler and advised him of what he had learned. Crisler told Barnes that he and his brothers "were not prepared to pay the

money back because they would have to come out of pocket to do it." Crisler said that "they had used money to pay off a student loan" but did not tell Barnes exactly how much they lacked in order to repay the entire $1,000,000.00.[14]

The next day, December 9th, Barnes flew to Greenville, SC to personally meet with Scott and his wife. Barnes showed them a summary of the checks written by Farr and explained how Farr kited the checks between the trust accounts and the petty cash account in order to fund their settlement. He showed Crisler a copy of Haugabook's check and described how Farr had borrowed the money that he wired to them. Finally, Barnes explained that he had searched Farr's computer and discovered that Farr had fabricated all of the legal pleadings that Farr had sent them and that Farr had never even filed a lawsuit. Barnes reported that NeSmith had just prepared and filed the real lawsuit regarding their mother's wrongful death.

Barnes then let Crisler know that Haugabook wanted his money back and would be coming after them for the money. Barnes recalls telling Crisler that if they wanted to keep the money, they were going to have to "fight like hell to do it" and that they would need a lawyer. However, Barnes apparently did not specifically ask Crisler to give the money back. From the record, it appears that the Crislers never asked the Defendants to cover the amounts they needed to make up Haugabook's $1,000,000.00 and that the Defendants never offered to do so.

---

[14] At oral argument, the Firm Defendants provided a summary indicating that as of December 9, 2006, the Crislers had only $906,000.00 of the fictional settlement funds. The documents further indicate that the Crislers collectively spent around $50,000.00 between the time when the Defendants first suspected fraud and when Barnes informed them that the $1,000,000.00 might not really belong to them.

## IV.   PLAINTIFFS' CLAIMS[15]

### A.  Malpractice in the Wrongful Death Litigation

The Defendants' handling of the wrongful death claim forms the genesis of the Crislers' present claim for damages. First, Plaintiffs allege that Farr breached his duty of care, skill and diligence to Plaintiffs and behaved in a grossly negligent manner in his performance of his legal services to the Plaintiffs. Moreover, Plaintiffs allege that Farr knowingly and fraudulently misrepresented his investigation regarding their mother's wrongful death claim, and Plaintiffs justifiably relied upon these misrepresentations to their detriment. As a direct and proximate result of Defendant Farr's intentional and fraudulent actions, Plaintiffs allege that they were injured and suffered significant damages, entitling them to at least $1,000,000.00 in damages from Farr, plus interest, from the date of loss, punitive damages, consequential damages, and attorney's fees.

Additionally, Plaintiffs have sued Defendants Barnes and NeSmith (in their individual capacities) and the Firm under the theory of *respondeat superior* to recover for Farr's action. Plaintiffs also complain that Barnes, NeSmith and the Firm committed legal malpractice, negligence, breach of fiduciary duty and constructive fraud in their own right, so that they should be jointly and severally responsible for the same damages and other relief as sought against Farr.

Specifically, Plaintiffs allege that Barnes and NeSmith failed to investigate the situation promptly to determine what, if any, affect Farr's actions may have on the Firm's clients, i.e., the Crislers, despite learning that Farr's behavior could potentially

---

[15] This section does not include the Plaintiffs' claims for punitive damages and attorneys' fees in this case based upon O.C.G.A. § 9-15-14.

Crisler v. Farr
10-CV-17
Page 20

harm them. Plaintiffs further allege that Defendants learned of Farr's conduct early enough so that prompt remedial action could have mitigated some of the damage that Plaintiffs suffered.

Additionally, the Crislers allege that Defendants negligently or willfully disclosed confidential information about their attorney/client relationship, misrepresented important matters to Plaintiffs, and actively worked with others against the interests of Plaintiffs, putting their and the Firm's interests first. Moreover, Plaintiffs claim that as Plaintiffs' attorneys, Defendants held a position of trust with Plaintiffs and violated that position of trust, constituting constructive fraud. Specifically, Plaintiffs claim that Defendants used their position of trust to mislead Plaintiffs about the status of their case and withheld information from the Plaintiffs about the settlement funds wired to them and the subsequent loan from Haugabook to cover it.

Plaintiffs also contend that Barnes and NeSmith negligently failed to ensure that the Firm had effective measures in place to give reasonable assurance that all lawyers in the Firm conformed to the Georgia Rules of Professional Conduct.

As noted *supra*, Farr admitted that in a "John Doe" hit-and-run wrongful death case against property owners accused of negligently maintaining their property or otherwise posing a risk of harm to business invitees, a prudent lawyer would investigate all potential leads as soon as possible before "evidence can get lost or people can forget things." However, Farr certainly did not take such immediate action, and arguably made no meaningful investigation whatsoever. Farr failed to identify both the shopping center tenants and their employees, obtained neither the

coroner nor the medical examiner's files, never spoke with the District Attorney's investigator in charge of the investigation, did not interview potential witnesses or any of the news reporters regarding their sources, performed no legal research to determine if the shopping center violated any codes or ordinances, and never learned whether the owners of Hunter's Mill knew of prior parking lot accidents.

In addition to failing to investigate the claim, Farr never attempted to file the Crislers' lawsuit, but instead told the Crislers an outrageous series of lies about successful progress in the case and settlement.

Eventually, Farr manufactured a fictitious settlement in the Crisler case. Plaintiffs claim that Farr had done so on seven prior occasions. Farr admits that he did use his own funds to pay settlements to or on behalf of seven particular clients. Barnes and NeSmith adamantly assert that they learned of only two other manufactured settlements and, importantly, that they obtained this information **AFTER** December 8, 2006.

According to Farr, he suffered from an unreasonable lack of judgment that caused the manufactured settlements. Farr admits that a lawyer owes a fiduciary duty to his client and agrees that he breached that duty when he deceived his clients in the manufactured settlement cases.

As Farr's story began to unravel, Barnes and NeSmith obviously came to suspect fraud and misrepresentation on Farr's part. However, the parties disagree as to the precise moment when the Firm Defendants reached a definitive conclusion, and whether they breached any duty owed to the Crislers by failing to inform the

Crislers of the circumstances of their case in a timely fashion, specifically failing to inform them that they might not be entitled to spend the "settlement money."

Although Barnes denies that he learned that Central Bank suspected that Farr was kiting checks early in the day of November 27th, it remains undisputed that by that evening, Barnes knew of the following: on or about November 22nd, Farr began trying to wire $1,000,000.00 from the Firm's trust account at Central; Farr had written a $1,000,000.00 check from the Firm's petty cash account at SB&T, which would have bounced; checks were missing from the SB&T and the Citizens trust accounts; a facsimile from Citizens showed a $1,000,000.00 trust account check drawn on SB&T and deposited into Citizens on November 22nd; the same fax also showed a $1,000,000.00 petty cash account check drawn on SB&T and deposited at Citizens on November 24th.

Plaintiffs note that during any period of possible uncertainty or suspicion by the Firm, Farr's work on the Crisler file remained readily available to Barnes and NeSmith so that they could have confirmed Farr's explanation of the strange events. Like many firms, the Firm has a computer network that allows any lawyer to access the electronic file of any client. Thus, even if the Crislers' physical file was unavailable for inspection, Plaintiffs contend that Barnes and NeSmith could have at least accessed the Plaintiffs' electronic file upon learning that the Crislers were the Firm's clients who received a million-dollar settlement on November 27th.

Sometime after November 27th, Farr admitted to Barnes and NeSmith that he never actually filed the wrongful death action on behalf of the Crislers, but that "the statute would expire the following week, and he was going to make sure that the [suit

was filed] and the case would proceed." After meeting with Barnes and Haugabook, NeSmith immediately left to file the wrongful death complaint before the looming expiration of the statute of limitations, less than a week away. On the afternoon of December 8, 2006, Barnes called Crisler to explain the situation and to let him know that they might not be entitled to the $1,000,000.00.

After NeSmith timely filed the wrongful death claim, the Firm withdrew from the suit both upon request by the Crislers and pursuant to the Rules of Professional Responsibility. After their withdrawal, Plaintiffs hired Davis & Melton, P.C. and The Webster Firm, P.C. to handle the matter, incurring significant attorney's fees because of the new attorney-client relationships and continuing litigation.

Prior to submitting himself to the jurisdiction of the court in the Haugabook Litigation, discussed *infra*, and thus being restrained from spending the funds, Scott Crisler made retainer payments to Greg Melton; Fortson, Bentley and Griffin; and Craig Webster, for a combined total of $65,000.00. Crisler made these payments to cover the defense of the Haugabook claim and to continue to pursue the wrongful death claim that NeSmith filed. Eventually, the Crislers, with the aid and advice of new counsel, settled their wrongful death claim (prior to trial) for a confidential sum, purportedly so that they could pay their attorneys to continue to fight the Haugabook Litigation.

In defense, Defendants argue that notwithstanding the late filing of the suit and the delay in any meaningful investigation, the Plaintiffs nonetheless had a full and complete opportunity to litigate their case and they chose to settle it before trial. Although the Plaintiffs admittedly received less than the $1,000,000.00 settlement

Crisler v. Farr
10-CV-17
Page 24

amount that Farr created, the Defendants contend that the Plaintiffs cannot offer any concrete evidence that they would have received more if Farr had investigated earlier. Further, the Defendants claim that the Plaintiffs eventually received the information they claim Farr should have obtained earlier, so that any delay in investigation did not proximately cause the Plaintiffs to receive a settlement sum significantly less than the $1,000,000.00 settlement amount received from Farr.

Specifically, Defendants point out that the Plaintiffs, through their new lawyers, discovered the following facts: the shopping center owners had no knowledge of prior parking lot accidents; no evidence of previous similar pedestrian incidents in the parking lot existed; the police reports containing relevant information were still available; and Farr's delay in investigating had no impact on the availability of information regarding whether the shopping center violated any codes or ordinances. Furthermore, despite the delay caused by Farr, Webster still retained an expert witness, Herman Hill, who issued an expert report and testified at deposition favorably in support of the Crislers' position. The Defendants also point out that law enforcement never resolved the hit-and-run incident even after an active investigation, and Webster did not direct his investigator to locate the at-large driver. Additionally, Defendants claim that Webster never told the Crislers he believed that they could obtain a jury verdict in excess of the eventual confidential settlement even if the investigation had been pursued in a timely fashion.

According to Defendants, these aggregated facts show that the Plaintiffs cannot offer any specific and admissible evidence to support their claim that they

were forced to accept a much smaller settlement amount than they would have received but for the untimely investigation and filing of the suit.

However, the Plaintiffs disagree, arguing that the passage of time did in fact prejudice Webster's eventual investigation and negatively affected the size of the confidential settlement. Since almost two years passed between Ms. Crisler's death and the beginning of Webster's investigation, the Plaintiffs claim that they could not establish the precise location of the accident. Specifically, the attorneys for the Plaintiff note that although the bloodstains marking the precise site of the accident had long washed away before Webster began his investigation, the bloodstains probably would have remained on the asphalt for around thirty days. Along with the autopsy report (discussed below), Plaintiffs allege that this evidence might have provided valuable information regarding the angle from which the car struck Ms. Crisler. The Plaintiffs contend that their inability to establish the exact location of the accident comprised a significant weakness in their case.

Plaintiffs also note that Farr's delay hampered their ability to obtain favorable witnesses, some of whom might have testified to using the parking lot as a cut-through (although the admissibility of such testimony is debatable). Additionally, Greg Melton testified that although the passage of time did not affect their ability to perform surveillance of the parking lot, the passage of time lessened the probative value of the patterns discovered. Therefore, although the expert actually testified that the traffic patterns did not change during the time that passed between Ms. Crisler's death and the delayed investigation, Plaintiffs argue that the lessened

probative value of that evidence affected the amount of possible damages and thus the amount of the settlement.

## B. The Haugabook Litigation:

On December 22, 2006, Haugabook initiated a lawsuit against Geoffrey Crisler and Christopher Crisler in the Superior Court of Athens-Clarke County to recover the $1,000,000.00 that Farr fraudulently obtained from him and wired to the Plaintiffs (the "Haugabook Litigation"). Scott Crisler, originally outside of the jurisdiction of the court, eventually submitted himself to the jurisdiction and Haugabook amended his complaint to add him as a defendant. Haugabook asserted claims against the Crisler Brothers for money had and received, unjust enrichment, subrogation, constructive trust, and conversion, and sought injunctive relief, punitive damages, and expenses of litigation.

Upon the filing of the lawsuit, the court issued a Temporary Restraining Order ("TRO") against Geoffrey and Christopher Crisler, directing them to cease any act that would dissipate funds received from Farr or the Firm, and to pay the funds into the Registry of the Court on or before December 29, 2006. Within four days, the Crislers responded by declaring the Haugabook Lawsuit to be without merit and requested that the court remove the provision requiring payment of the funds into the Registry of the Court, which the court granted.

However, as noted previously, the Crislers no longer had the full $1,000,000.00 that Haugabook demanded; the Defendants estimate that the remaining funds totaled approximately $946,000.00 on December 22, 2006, the day that Haugabook filed suit. By the date of the Court's order to pay the funds into the

registry, the Crislers had spent more of the settlement funds and had also invested part of the funds, including an investment in Wells Real Estate Trust II (the "REIT"), which could not be liquidated without penalty.

With the court issuing a TRO requiring them to pay the money into the registry upon the filing of the suit, the Crislers allege they were effectively forced to immediately obtain counsel to defend themselves. In order to retain counsel, Scott Crisler, who was not yet a defendant in the Haugabook Litigation (due to lack of personal jurisdiction over him) and thus not subject to the TRO, wired $20,000.00 of the settlement funds to the law firm of Davis and Melton on December 28. The Crisler brothers used those funds to retain Greg Melton as well as Fortson, Bentley and Griffin to defend them in the litigation. In doing so, Scott Crisler used only his portion of the now-disputed settlement funds. Prior to submitting himself to the jurisdiction of the Court on March 16, 2007, Scott Crisler paid an additional $45,000.00 in attorney fees to Greg Melton; Fortson, Bentley and Griffin; and Craig Webster.

Because Haugabook very clearly demanded the return of the entire $1,000,000.00 he loaned to Farr, and the Crislers did not have the entire $1,000,000.00, the Crislers contend that they had no choice but to defend themselves in the Haugabook suit. At his deposition, Scott Crisler explained that he had used a portion of the settlement money to defend the Haugabook Litigation because he "didn't have any choice" as he "had been put in this situation, and [he]

didn't have the funds to defend [himself] from it." Greg Melton confirmed that the Crislers essentially felt threatened from the beginning.[16]

The Crislers also understood Haugabook's entitlement to a return of the $1,000,000.00 as far from clear. In fact, University of Georgia Law School Professor Julian B. McDonnell, who spent his professional career devoted to teaching and writing about the Uniform Commercial Code as well as common law and equity related to commercial matters, reviewed the facts and circumstances and opined that the Crislers had the superior equitable claim to the $1,000,000.00 transferred by the Firm.

In early August of 2007, while cross-motions for summary judgment were pending, the Crislers offered Haugabook the opportunity to mediate the case in an effort to reach settlement. However, Haugabook's counsel indicated that he had no interest in mediating or settlement negotiations. As a result, the Crislers continued to defend the claims.

On September 21, 2007, the Honorable Steve C. Jones of the Clarke County Superior Court issued a detailed order granting summary judgment in favor of the Crislers, holding that each of Haugabook's claims was legally flawed. Haugabook filed a notice of appeal to the Court of Appeals of Georgia and by way of opinion dated March 26, 2009, the Court of Appeals reversed the trial court's decision and remanded the case for entry of an order awarding summary judgment in favor of

---

[16] The record indicates that within 30 days after NeSmith filed the wrongful death suit in Albany, Haugabook's counsel contacted the Crislers' attorney and made it very clear that Haugabook demanded the immediate return of $1,000,000.00 and no less.

Haugabook after considering only the claim of money had and received.[17] Following the denial of the Crislers' petition for certiorari, the trial court received and filed the Court of Appeal's remittitur on October 29, 2009.

Upon remittitur from the Court of Appeals and before final judgment, the Crislers paid Haugabook all of the money they possessed, approximately $890,000.00, previously held subject to the interlocutory injunction. The Crislers further assigned and transferred their shares of the REIT that they were unable to liquidate into cash, valued at $154,432.35.

On February 9, 2010, over the Crislers' objection, the trial court entered a final judgment, including prejudgment interest from the date of the original demand, in favor of Haugabook for more than $1,350,000.00. The Plaintiffs appealed the prejudgment interest award to the Court of Appeals, which again affirmed the trial court on February 11, 2011, holding that a liquidated damages award requires the trial court to award prejudgment interest.[18] However, the Supreme Court of Georgia granted certiorari on September 6, 2011, to reexamine the decision of the Court of Appeals regarding the award of prejudgment interest.[19]

Despite tendering all of the money and investments retained from the fictitious settlement funds received from Farr, the Plaintiffs still owe Haugabook more than

---

[17] See Note 2, *supra, p.3.*

[18] See Note 3, *supra, p.3.*

[19] *Id.*

$340,000.00, with post-judgment interest continuing to accrue.[20] During the Haugabook Litigation, the Crislers also incurred attorney's fees and expenses, totaling $219,056.87 as of May 13, 2011, of which $43,644.10 remains unpaid.

## V. ANALYSIS

### A. Plaintiffs' Claim for the Difference in Settlement Amounts

Plaintiffs claim that the Defendants must pay them the difference between the $1,000,000.00 in "settlement" funds they received from Farr and the far lesser amount for which they actually settled their case. As discussed in detail above, Plaintiffs allege that Defendants Farr, Barnes, and NeSmith all negligently handled the wrongful death claim, committed legal malpractice and fraud, and breached their fiduciary duties. Also, the complaint alleges that even if Defendants Barnes, NeSmith, and the Firm did not directly cause the diminution in value of the Plaintiffs' claim, they are still liable for the diminution in value under theories of *respondeat superior*, vicarious liability and legal malpractice/negligence for failing to prevent Farr's malfeasance.

For the reasons set forth below, the Court **GRANTS** each Defendant's Motion for Summary Judgment as related to the Plaintiffs' claims for the diminution in value of the wrongful death lawsuit.

To prevail on a legal malpractice claim, a litigant must show that "(1) he employed the defendant attorney; (2) the attorney failed to exercise ordinary care, skill, and diligence; and (3) ***this failure was the proximate cause of damages to***

---

[20] According to the Defendants, as of May 16, 2011, the Crislers have paid $900,263.56 towards the judgment, leaving the Plaintiffs owing $99,736.44 toward the principal balance, all of the prejudgment interest and all accrued post-judgment interest.

*the client." Holmes v. Peebles*, 251 Ga. App. 417, 419 (2001) (emphasis added). Thus, in order to recover for legal malpractice action, "any failure of an attorney 'to exercise ordinary care, skill, and diligence' must proximately cause the plaintiff's damages." *Goodman v. Glover*, 247 Ga.App. 829, 830 (2001), *quoting Tante v. Herring*, 264 Ga. 694, 694 (1994). Likewise, in a cause of action for fraud, a plaintiff must show: "(1) [a] false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; and (5) *damage to the plaintiff." Marriott Corp. v. Am. Acad. of Psychotherapists, Inc.*, 157 Ga. App. 497, 498-99 (1981) (emphasis added). Similarly, in claims for breach of fiduciary duty[21] and negligence,[22] the claimant must show that the defendant's breach proximately caused the plaintiff's damages.

The Court remains mindful that "questions regarding proximate cause are undeniably a jury question and can only be determined by the courts in plain and undisputed cases." *Pruette v. Phoebe Putney Mem. Hosp.*, 295 Ga. App. 335, 338 (2008). However, evidence of causation may not be speculative or conjectural and in the absence of evidence raising a fact question on the issues of proximate cause or

---

[21] *Perry Golf Course Dev., LLC v. Housing Auth. of City of Atlanta*, 294 Ga.App. 387, 393 (2008) ("A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.") (internal citations omitted).

[22] *Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 492 (1991) *abrogated in part and on other grounds by Robinson v. Kroger Co.*, 268 Ga. 735, 735 (1997) ("The traditional elements of a negligence case are: (1) A duty, or obligation, recognized by law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks[;] (2) A failure on his part to conform to the standard required ...[;] (3) A reasonable close causal connection between the conduct and the resulting injury ...[;] (4) Actual loss or damage resulting to the interests of the other.").

damages, summary judgment is proper. *See, Oehlerich v. Llewellyn*, 285 Ga. App. 738, 740 (2007).

The Court finds that this is one of those "plain and undisputed cases" because Plaintiffs have failed to offer any evidence that Defendants' alleged actions of legal malpractice, fraud, breach of fiduciary duty, or negligence **solely** caused the Plaintiffs to settle their case for a sum less than the fictitious $1,000,000.00 figure that Farr seemingly plucked from the air. Although Farr may have told the Plaintiffs that their suit had settled for $1,000,000.00, the evidence shows that Farr did not base this figure on anything other than his creative imagination and his web of lies. Just because Farr lied when he told the Plaintiffs that their case was worth $1,000,000.00, the Plaintiffs cannot now insist that they be paid such a fanciful amount without clear and concrete proof that their case really was worth seven figures.

The Plaintiffs' allegations that the Defendants would have developed better or different evidence or that they could have reached a superior result had Farr actually pursed the case are, at best, nothing more than pure speculation. Georgia law clearly mandates that claims based on nothing but conjecture and speculation must not survive summary judgment:

> To establish proximate cause, the client must show that but for the attorney's error, the outcome would have been different; any lesser requirement would invite speculation and conjecture. **The defendant attorney is entitled to summary judgment if he shows that there is an absence of proof adduced by the client on the issue of proximate cause.**

*Holmes*, 251 Ga. App. at 419. (emphasis added)

Indeed, Plaintiffs' entire argument that they were damaged by Farr's handling of the wrongful death claim appears to be built entirely on speculation and

guesswork. The record lacks any evidence that the wrongful-death defendants would have paid more money to settle the case if Farr had only filed and/or worked on the case sooner. In fact, it is possible that the defendants in that litigation would have offered Farr less money than what was offered to the Plaintiffs' replacement counsel. Georgia law clearly requires that claims predicated upon theoretical settlements must prove that the higher settlement "would have" occurred; speculating or guessing what "might have" or "could have" happened will not allow such a plaintiff to escape summary judgment. See, *Meiners v. Fortson & White*, 210 Ga. App. 612, 613 (1993).

If anything, the undisputed evidence in the record establishes that the Defendants' conduct had very little, if any, impact on the ultimate value of the wrongful death claim. Plaintiffs obtained replacement counsel from two separate law firms: Greg Melton, Esq. and Craig Webster, Esq., who were able to conduct an extensive investigation into the issues and facts in the underlying lawsuit. Although the Plaintiffs contend that Farr should have started investigating their case much earlier, they failed to provide evidence of any specific witness or other document that the delay in the investigation caused to be unavailable to them. For example, the Plaintiffs complain that Farr should have immediately determined whether the owners of the shopping center knew of prior accidents in the parking lot; however, their replacement attorney, Webster, pursued this information and learned that no previous, similar pedestrian incidents had occurred in the parking lot. Plaintiffs also allege that Farr should have "consulted with or retained . . . an expert witness"; but, Webster ultimately retained Herman Hill, who issued an expert report and testified favorably for Plaintiffs during his deposition.

In fact, Plaintiffs have only identified a single document they contend would have enabled them to demand a higher value for the wrongful death claim -- the autopsy report. Webster acknowledged that the autopsy report was very important for establishing the point of impact and information regarding the speed of the vehicle which struck and killed Ms. Crisler. However, Greg Melton received the report early in March of 2007, a mere ten weeks after Plaintiffs retained new counsel. For unexplained reasons, Melton never shared this document with Webster. Even if the Court accepted that the absence of this report drastically impacted Webster's ability to litigate the wrongful death claim, the fact remains that at least one Plaintiffs' attorneys knew of the document and actually had a copy of it in his files. Melton's failure to share the document with Webster cannot be attributed to any of the Defendants.

Next, damages are generally given as compensation for injury that is of a character that is capable of being estimated in money. O.C.G.A. § 51-12-4; *Bond v. Davis*, 194 Ga.App. 379, 380 (1990). Even to assert nominal damages, a claimant must show some injury. *Willett v. Russell M. Stookey, P.C., et al.*, 256 Ga.App. 403, 411 (2002). Regarding damages, the Plaintiffs' evidence suffers from the same fatal flaw as their evidence on proximate cause; it is based on nothing but speculation and guesswork. Thus, the Court must grant summary judgment in favor of the Defendants.

The Court reaches the same conclusion under the alternative theories of *respondeat superior* and vicarious liability. Assuming that Plaintiffs could show that Defendants Barnes, NeSmith, and the Firm should have prevented Farr's conduct

(and, as discussed below, this Court is not so convinced), the alleged damages Plaintiffs suffered are simply far too speculative to award recovery. Thus, the Court **GRANTS** summary judgment to all Defendants for all claims relating to the underlying wrongful death litigation.

### B. Plaintiffs' Claims As Related to the Haugabook Litigation

#### 1. Defendant Farr

Plaintiffs also allege that as a result of Defendant Farr's conduct, the Plaintiffs were "forced to defend themselves in a lawsuit with Richard C. Haugabook for over three years." (Complaint, ¶ 67). In the Haugabook Litigation, Farr's father-in-law, Richard Haugabook, sought to recover the $1,000,000.00 that Farr had defrauded him of and that Farr used to funds the Plaintiffs' fake settlement. No longer in possession of the full $1,000,000.00, the Plaintiffs contend they had no choice but to defend themselves in the litigation. The Georgia Court of Appeals eventually ruled in favor of Haugabook and concluded that Plaintiffs had no right to retain the $1,000,000.00. The Court further ordered the Plaintiffs to pay back all of the money owed, including pre- and post-judgment interest. Plaintiffs now claim that Defendant Farr's bizarre and unbelievable conduct constituted legal malpractice, fraud, breach of fiduciary duty, and negligence that caused the Plaintiffs to eventually incur damages in the form of: 1) attorney's fees and expenses incurred in the litigation, (2) the unsatisfied principal in the Haugabook judgment, and (3) pre- and post- judgment interest on the Haugabook judgment.

No one can dispute that Farr caused $1,000,000.00 to be wired to the Plaintiffs and that he caused the Plaintiffs to erroneously believe for over ten days

that an insurance company had paid the money to settle their wrongful death claim. Further, the undisputed evidence shows that Farr defrauded his father-in-law out of $1,000,000.00 to cover the overdraft in the Firm's account. Had Farr never dreamed up this scheme, the Plaintiffs would never have been forced to hire attorneys and incur substantial fees defending themselves in the Haugabook Litigation.

Despite these undisputed facts, Farr now moves for summary judgment, brazenly claiming that he is not responsible for Plaintiffs' damages arising from the Haugabook litigation because the Plaintiffs' "intervening decisions" broke the chain of causation. The "intervening decision" to which Farr refers is the Plaintiffs' decision to defend themselves in a lawsuit. Farr's argument thus rests on the premise that Plaintiffs had a *choice* about whether to participate in the Haugabook Litigation. Farr also alleges that Plaintiffs assumed the risk that they could lose the Haugabook Litigation so that the Plaintiffs' decision to defend themselves absolves him from any and all responsibility for his actions.

As stated above, the Court may only look to see if there is a genuine issue of fact in deciding motions for summary judgment. *Fountain v. World Fin. Corp.*, 144 Ga. App. 10, 13 (1977). If the record reveals any conflict of admissible evidence creating an issue for the jury, the Court must deny the motion. *Id.*

In essence, the parties disagree over who caused the Plaintiffs to incur the costs of the Haugabook Litigation: attorney's fees (approximately $219,000.00); the unsatisfied principal of the Haugabook judgment (nearly $100,000.00); and the pre- and post- judgment interest on the Haugabook judgment (at least $340,000.00). "[Q]uestions regarding proximate cause are undeniably a jury question and may only

be determined by the courts in plain and undisputed cases." *Thomas v. Metro. Atlanta Rapid Transit Auth.*, 300 Ga. App. 98, 102 (2009). The Court finds that this is not such an undisputed case. Thus, the Court **DENIES** Farr's Motion for Summary Judgment as to all claims related to the Haugabook Litigation. A Sumter County jury will have to listen to the evidence and decide who actually caused the Plaintiffs to incur these costs. The jury may hear all of the evidence and argument on Farr's defense of assumption of the risk as well. After hearing the evidence, the jury can divide the costs as they see fit between the Plaintiffs and Farr.

## 2. Defendants Barnes, NeSmith and the Firm

Plaintiffs' claim that Defendants Barnes and NeSmith are also liable for the damages Plaintiffs suffered as a result of the Haugabook Litigation. This contention also fails as a matter of law. Unlike Farr's case, Plaintiffs have offered no evidence sufficient to create a jury question as to whether or not the conduct of Barnes or NeSmith proximately caused the Plaintiffs to be involved with the Haugabook Litigation. On the contrary, the record evidence definitively shows that whatever damages the Plaintiffs suffered were the direct result of Farr's actions, and Farr's actions alone.

Plaintiffs also seek to recover from (1) the Firm under a theory of *respondeat superior*, (2) from Defendants Barnes and NeSmith under a theory of vicarious liability, and, (3) from Defendants Barnes and NeSmith for failing to prevent Farr's fraud. However, even under the theories of vicarious liability and *respondent superior*, Plaintiffs' claims fail as a matter of law.

It is undisputed that the Plaintiffs considered Farr their lawyer from January 2005 until December 2006. None of the Plaintiffs met with, spoke to, or had any communication with Barnes or NeSmith. During this period, not only did Farr actively and deliberately deceive the Plaintiffs regarding his work on the wrongful death claim, he also deceived his own law partners. Defendants Barnes and NeSmith knew nothing of Farr's fraud or fictitious "settlement" until very late in 2006. After finally confirming Farr's fraud, they immediately acted to preserve the Plaintiffs' claim and did so. Although the Plaintiffs assert that Barnes and NeSmith should have called them as soon as they first suspected that Farr had engaged in any wrongdoing, they took a reasonable amount of time (considering the Thanksgiving Holiday) to investigate the claims so that they could give complete and accurate information to the Crislers.

Until December 8, 2006, Barnes and NeSmith believed that Farr had actually filed the underlying suit. When they learned that Farr had not filed the suit and that the statute was about to run, they acted immediately and preserved the Plaintiffs' claim. The Plaintiffs have cited no case that would require an attorney who has been defrauded by his partner to act as Plaintiffs suggest in this case. Given the unique facts of this case, Barnes and NeSmith acted reasonably to gather the full facts of the story before going to the clients.

Plaintiff alleges that the Firm is liable for Farr's acts and omissions under a theory of *respondeat superior*. However, generally in cases alleging liability under *respondeat superior*, Georgia Courts have repeatedly held that employers may not be held responsible for tortious acts of its employee committed outside the scope of

his or her employment. O.C.G.A. § 51-2-1; *Modern Woodmen of Am. v. Crumption,* 226 Ga. App. 567, 568-69 (1997). Georgia law further provides that a partner or officer cannot bind a partnership or a corporation beyond the normal scope of his authority. *See, Hobbs v. Principle Fin. Group,* 230 Ga.App. 410, 411 (1998). Thus, law firms are only liable for the torts committed by a partner "within the scope of his agency."[23] Farr's conduct is not only outrageous, but clearly falls far outside the scope of the law firm's business. Put another way, the Firm does not exist to defraud its clients. Thus, Farr's conduct was not done in furtherance of the Firm's business and served his own personal interests. Accordingly, the Firm cannot be held liable for Farr's conduct so that summary judgment is appropriate.

Plaintiffs' claims against Defendants Barnes and NeSmith for both vicarious liability and failing to prevent Farr's fraud fail for similar reasons.

Plaintiffs have not pointed to any Georgia case holding law partners individually liable for failing to prevent another partner's intentional, and unforeseen hidden misconduct like that engaged in by Farr. Further, courts in other jurisdictions have declined to adopt such a rule.[24]

Indeed, such a rule requiring law partners to continually look over their partner's shoulders and constantly investigate their partner's cases would undermine the very nature of such partnerships and fundamentally hinder the ability of attorneys to practice law effectively. What is clear under Georgia law is that Farr owed a

---

[23] *Flynn v. Reaves,* 135 Ga.App. 651, 652-53 (1975); *see also, Piedmont Cotton Mills, Inc. v. General Warehouse No. Two, Inc.,* 222 Ga. 164, 168 (principal may be liable only for tort of agent "done in the prosecution and within the scope of business").

[24] See, *Cecala v. Newman,* 532 F.Supp.2d 1118, 1141 (D.Ariz. 2007).

fiduciary duty to Barnes and NeSmith, including a duty to act with the highest loyalty. *Hendry v. Wells*, 286 Ga. App. 774, 783 (2007). In light of that duty, Defendants Barnes and NeSmith were not required to actively monitor and question Farr's activities to ensure that he was not engaging in conduct harmful to the clients. Farr was already required by his fiduciary duties to both his client and his firm to act with the utmost good faith, and Defendants rightly relied on Farr to do so. At most, Plaintiffs have shown that Defendants Barnes and NeSmith committed violations of the Code of Professional Conduct. Such a violation, standing alone, cannot support a claim for legal malpractice. *Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 265 Ga. 374, 374 (1995). Thus, Defendants Barnes, NeSmith, and the Firm's Motions for Summary Judgment are hereby **GRANTED** in full for any claim related to the Haugabook Litigation.

## C. Plaintiff's claims for Punitive Damages

Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. O.C.G.A. § 51-12-5.1; *Hall v. Browning*, 195 Ga. 423, 428 (1943). This Court can think of few cases better fitting this standard than the one at bar. Should a jury find that Plaintiffs' version of the facts in this case are correct and that Defendant Farr knowingly and deliberately deceived the Plaintiffs by creating a fictitious lawsuit and settlement agreement while failing to ever even properly file the claim, then the same reasonable jury could find that Farr's actions rise to the level of willful misconduct,

malice and wantonness that would give rise to punitive damages. Thus, Farr's Motion for Summary Judgment on the issue of Punitive Damages is **DENIED**.

However, as stated above, it is clear from the undisputed evidence presented in the record that Farr acted alone in his wanton misconduct and deceit, and thus, he alone will pay any punitive damages that a jury may ultimately award. Given the Court's earlier rulings, it is clear to the Court that neither Defendant Barnes, Defendant NeSmith, nor the Firm have committed any misconduct, let alone acted in such a way so as to warrant the consideration of punitive damages. Accordingly, the Court **GRANTS** Defendants Barnes, NeSmith and the Firm's Motions for Summary Judgment as to punitive damages and attorney fees.

## VI. CONCLUSION

The Court has great empathy for the Plaintiffs in this case. It is clear to the Court that Plaintiffs find themselves in grossly unfair circumstances. Further, the Court understands the Plaintiffs' frustration when they found themselves defrauded by their lawyer and suddenly owing $1,400,000.00 for something in which they had no part. However, the record equally demonstrates that Barnes and NeSmith neither caused this situation nor the damages the Plaintiffs suffered. Whatever damages the Plaintiff suffered are the sole fault of Farr. The Court holds the opinion that Farr acted alone when he unexplainably chose to deceive his clients, his partners and his firm by pretending to file a lawsuit and constructing several fictitious settlement documents, culminating in his defrauding his father-in-law out of $1,000,000.00. Farr carried out his deceitful scheme alone and he will face a jury the same way – absolutely alone.

Based on the evidence in the record, the briefs submitted by the parties and oral argument by counsel, the Court **GRANTS** Defendant Farr's Motion for Summary Judgment as to Plaintiff's claims regarding the underlying wrongful death claim but **DENIES** Farr's remaining grounds for summary judgment (Plaintiffs' various claims arising out of the Haugabook litigation, punitive damages and attorney's fees). Further, the Court **GRANTS** Defendants Barnes, NeSmith, and the Firm Summary Judgment in full as to each and every claim of Plaintiffs.

The Plaintiffs and Farr are hereby ordered to confer with the Court within 14 days to schedule a trial date on the remaining claims. The Parties are to submit a consolidated pretrial order within 30 days.

**SO ORDERED** this 12th day of January, 2012.

Tilman E. Self, III
Judge, Superior Courts of Georgia
Macon Judicial Circuit (sitting by designation in the Southwestern Judicial Circuit)